IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD RANGEL SALAZAR,<br>   Petitioner,<br> vs.<br>DARRELL ADAMS, Warden,<br>   Respondent. | No. C 05-3250 CRB (PR)<br><br>ORDER DENYING PETITION<br>FOR A WRIT OF HABEAS<br>CORPUS |

   Petitioner, a prisoner at the California Substance Abuse Treatment Facility and State Prison, Corcoran, seeks a writ of habeas corpus under 28 U.S.C. § 2254 challenging a judgment of conviction from the Superior Court of the State of California in and for the County of Santa Clara.

### STATEMENT OF THE CASE

   A jury found Petitioner guilty of two counts of aggravated sexual assault on a child under 14 and more than 10 years younger than defendant ("counts 1 and 2"). The jury also found Petitioner guilty of two counts of forcible lewd and lascivious conduct on a child under 14 ("counts 3 and 4"). On September 24, 2002, the trial court sentenced Petitioner to 60 years to life.

   On February 10, 2004, the California Court of Appeal, Sixth Appellate District, affirmed the judgment of the trial court. On May 12, 2004, the Supreme Court of California denied review.

   On August 10, 2005, Petitioner filed this instant federal petition for a writ of habeas corpus under 28 U.S.C. § 2254. Per order filed on January 12, 2006, the court found that the petition, when liberally construed, stated cognizable

claims under § 2254 and ordered Respondent to show cause why a writ of habeas corpus should not be granted. Respondent filed an answer on June 14, 2006. Petitioner filed a traverse on July 24, 2006.

## FACTUAL BACKGROUND

The California Court of Appeal summarized the facts of the case as follows:

> Defendant was in a relationship with A. for approximately two and a half years. The relationship began in January of 1999. A. has five children; defendant is the biological father of one of the five. A.'s oldest children, 7-year-old R. and six-year-old J., were born before A. met defendant. A. testified that R. and J. were severely disciplined by defendant, that he was "harder on them than he was the other children." A. saw defendant spank J. and R., punch them, hit them with a belt, and place them in cold water. A. also saw defendant make R. and J. stand in a corner sometimes for "hours." A. had a "problem" with how defendant treated R. and J. She tried to leave defendant once but he "wouldn't let [her];" at that time, he pushed her and made her fall "over onto some buckets," causing the children to cry.
>
> At approximately 6:20 a.m. on July 8, 2001, San Jose Police Officer Daniel Hawes went to the residence of defendant and A. in response to a caller requesting a "welfare check" of young children playing in the street without adult supervision. Hawes found three of A.'s children, including J. and R., running and playing in the street unsupervised. They were "[v]ery dirty and unkempt," and their feet, legs, and hair were "grimy" as if they had not been bathed "in some time." The children reported that they had crawled out a bathroom window. In response to the officer's pounding, A. and defendant opened the door to their studio apartment, which was messy and filthy, with spilled food on the ground. In response to learning the children had gone outside while he was asleep, the defendant was "[a]pathetic." He appeared more concerned about his own two children than he was about R. and J. [FN] J. and R. were taken to a children's shelter.
>
> [FN] Defendant was the biological father of one of A.'s children. A. had been pregnant when defendant met her, and he considered the child "as mine" even though he was not her biological father.
>
> Registered nurse Robin Brown examined J. and R.

2

when they arrived at the shelter. Brown testified that both were very frightened and very dirty when they arrived. At first J. was very quiet and "in herself" but then she "just started telling [Brown] things during the exam" that "were very disturbing." J. was "quivering and scared" as she said that defendant had hit her, that he had put her in a cold bath for punishment, and that he "would hold her head in the water." J. also told Brown that defendant would make her and R. remove all their clothes and make her "lay *[sic]* on top of [R.]." After J. made this last disclosure, she hid under the examining table for at least ten minutes. R. told Brown that defendant often hit him with a belt and that defendant hit him "a lot and even if he wasn't bad." R. asked Brown if he and J. could "stay at the shelter as long as we want to." He also asked, "do you think if they make us go home, do you think if the policeman could come sometimes and look in the window and make sure we are okay."

Registered nurse Anabelle Ablan did separate physical skin assessments of R. and J. at the shelter. R. "spontaneously" told Alban that defendant had been "mean" to him and J., that he made them stay in the corner overnight without food, and that he spanked R. and hit him with a belt "for no reasons." Ablan noticed bruises on R.'s arm and on the back of his legs; Alban testified the leg injuries appeared to be belt marks. R. told Alban defendant had made J. get on top of R. and that defendant pulled down J.'s pants and then had R. hold J.'s "butt cheeks." R. added that defendant made R. and J. "hold each other's butt." Alban found bald spots on the back of J.'s head.

When R., later was examined at Valley Medical Center, no evidence of injury or sexually transmitted disease was found. J. did not wish to be examined.

When rehabilitation counselor Kristen Nigh spoke with J. at the shelter, J. was playing with toys when she said she needed to tell Nigh a "secret." J. then whispered that defendant "makes me lick his wee-wee and puts his wee-wee in my butt and shakes me up and down." J. said these sex acts occured "a lot." J. added that defendant had told her "not to tell anyone" or he would do these things again. J. said these threats had scared her.

R. testified at the July 2002 trial that he was seven years old. When R. had lived with defendant, defendant had hit R. for no reason, put him in the corner "a lot," and had placed R. in a cold bath and dunked his head on more than five occasions. He left R. in the bathtub all night; R. would get out after defendant fell asleep. In the bedroom, defendant once pulled down his own pants and underwear, "his private came out," he put both his hands on R.'s head, he pushed R.'s

3

head down toward his "private," and he forced R., to put his "whole mouth [ ] on his private." Defendant's "private" stayed "up" while defendant's hands pushed R.'s mouth up and down. This made R. feel badly. When R. tried to remove his mouth from defendant's private, defendant would make R. stay there longer, telling R. to "do it some more." R. said defendant went "to the bathroom a little bit" in R.'s mouth. R. said "something" came out of defendant's private, it went into R.'s throat, and it tasted "bad." When R. told defendant he "peed in my mouth a little bit," defendant said "it was not pee." R. then swallowed it. Defendant also made R. and J. get on top of each other.

J. testified that she was six years old at the time of trial. J. testified that defendant repeatedly had dunked her head in cold water and that he had pulled down his underwear and forced J. to "suck his private part." Defendant had his hands on his "private part" when it was in J.'s mouth. When she tried to push him away, she could not do so. She also felt she could not say no to defendant "[c]ause he's a grown up." Defendant told J., "if you do it more I'll give you some soda." J. did not like it when defendant placed his private part in her mouth. J. said she was forced to suck defendant's private part five more times.

A.'s mother testified she had had custody of R. and J. in 1998 and 1999 because A. had no home. In 2001, the children were living with A. and defendant. On Easter Sunday 2001, A.'s mother visited and saw a bruise "in the form of a handprint" on J.'s face.

District Attorney's investigator Carl Lewis, an expert in Child Sexual Abuse Accommodation Syndrome, testified regarding the pattern of observed behaviors in victims of sexual abuse that include secrecy, helplessness, entrapment and accommodation, delayed or conflicted disclosure, and retraction.

J.'s foster parent testified that, on July 18, 2001, she was giving J. a bath when J. said defendant had touched her private parts. J. also said defendant had pulled her hair. The foster parent had seen a bald spot on the back of J.'s head.

When San Jose Police investigator Don Guess interviewed J. and R. on July 11, 2001, J. spontaneously told Guess that defendant put his "wee-wee" in her mouth. With diagrams Guess clarified that J. "termed the penis as the wee-wee." A videotape of R.'s interview was played to the jury. In it, R. stated that defendant forced J. to lie on top of R. with their stomachs touching. R. added that defendant had told R. to put his mouth on defendant's "wee-wee" and that defendant peed in his mouth and he could feel warm liquid

4

> going down. Defendant had threatened that R. had "better" do this.
>
> Guess contacted defendant for an interview. Defendant cancelled one appointment and then did not return telephone calls from Guess.
>
> Over objection, the prosecution admitted certified copies of a juvenile petition and adjudication regarding two prior sexual assaults defendant committed as a juvenile.
>
> Defendant testified that he did not molest either R. or J. Defendant, who was 21 years old at the time of trial, testified that he had met J. and R. on January 1, 1999. He denied disciplining J. and R. by placing or dunking them in a cold bath, but he admitted having made them stand in the corner and that he had spanked each of them with a belt "about three times." He stopped using the belt on J. and R. after he had caused "a welt" to appear on R. Defendant said J. and R. thought that he was "mean." He had seen R. and J. "act out in ... a sexual way" by trying to take each other's pants off and "getting on top of each other," alternating who would be on top. Defendant said he witnessed this behavior "many, three times" during 1999. Defendant testified that R. once came into the bedroom when [A.] was performing "oral sex" on defendant. Defendant testified he believed J. and R. had truthfully testified that they had been molested and that "the jurors should believe the kids except for the part where they say [defendant] is the person that did it."

*People v. Salazar*, No. H025084, 2004 WL 238805, at *1-3 (Cal. Ct. App. Mar. 9, 2004).

## DISCUSSION

A.   Standard of Review

This court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable

application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.*

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." *Id.* at 409.

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. *Id.* at 412; *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. *Id.*

B. <u>Claims</u>

Petitioner presents four claims for relief under § 2254. Petitioner's first claim is that the trial court's admission of hearsay testimony under the "fresh complaint" doctrine a) violated his due process rights and b) his right to confront his accuser. Next, Petitioner claims his trial counsel rendered ineffective assistance by failing to make the proper objection to the admission of Petitioner's prior juvenile adjudication. Petitioner's third claim is that his due process rights were violated when the trial court denied his "1385 motion" to dismiss counts 3 and 4. Lastly, Petitioner claims cumulative error denied him his right to a fair trial. For reasons stated below, Petitioner's first and third claim will be analyzed concurrently in section B.1.a.

    1. <u>Admission of Testimony Under the "Fresh Complaint" Doctrine</u>

        a. <u>Due Process</u>

Petitioner claims that the trial court erred in admitting hearsay testimony from nurses Robin Brown and Annabelle Ablan, as well as rehabilitation coordinator Kristin Nigh and foster mother Maiela Saistin, under the "fresh complaint" doctrine. He argues that under the holding in *People v. Brown*, 8 Cal. 4th 746 (1994), the fact a complaint was made and the circumstances surrounding its making are the only statements admissible, and yet the prosecutor

> did not limit her references to the testimony of these women as simply evidence that the complaint was made. [The prosecutor] used these women's testimony as support for R. and J's believability about the nature of the defendant's actions and for the proposition that [the defendant] was the perpetrator of specific offenses against them.

Pet. at 18.

In his first claim, Petitioner contends that without the admission of the improperly admitted hearsay testimony there was not enough evidence to support

7

every element of counts 3 and 4.  He argues that his resulting conviction was a violation of his due process rights.  In his third claim, Petitioner contends that his due process rights were violated when the trial judge did not grant his "1385 motion" and dismiss counts three and four, after the verdict, due to lack of evidence.  The thrust of Petitioner's first and third claims is that without the admission of the "fresh complaint" testimony there was not enough evidence to prove that he received sexual gratification from forcing the children to lie on top of each other or, put simply, that he did not have the required specific intent for a conviction under California Penal Code section 288.

Petitioner's first and third claims will be analyzed concurrently because they essentially involve the same issue and were jointly analyzed by the California Court of Appeal.  The California Court of Appeal stated:

> In considering a motion to dismiss based upon insufficiency of the evidence to support the verdict, the trial court independently weighs the evidence. (*People v. Lagunas* (1994) 8 Cal.4th 1030, 1038, fn. 6, 36 Cal.Rptr.2d 67, 884 P.2d 1015.)  If there is a conflict in the evidence and the evidence believed by the trier of fact was sufficient to support the verdict, the trial court's ruling will not be reversed unless the record demonstrates an abuse of discretion. (*People v. Cluff* (2001) 87 Cal.App. 4th 991, 998, 105 Cal.Rptr.2d 80.)
>
> In this case, the evidence supports the jury's verdicts as to the challenged counts.  The jury was entitled to consider the testimony of both child victims as well as R's videotaped statement to the police. [FN] R. testified at trial that he truthfully told people that defendant had made J. and R. lie on top of each other.  R. told Detective Guess that defendant made J. lay on top of R. While defendant claims "there is absolutely no direct evidence of any sort in the record that [he] took any sexual gratification from these acts the children engaged in," the record established that defendant forced R. and J. to perform these acts in his presence.  The nature of the particular conduct and its surrounding circumstances, as well as the other sexually motivated acts defendant engaged in with R. and J., establish the requisite intent.
>
> [FN] R.'s videotaped interview with the police was admitted into evidence pursuant to the procedures set forth in Evidence Code section 1360.  That evidence was presented to the jury in videotape form, thus allowing the court to independently evaluate R.'s demeanor and responses to the questions. (*See Idaho v. Wright*

> (1990) 497 U.S. 805, 818-819, 110 S.Ct. 3139, 111 L.Ed.2d 638 [noting that videotaping may enhance reliability of out-of-court statements of children regarding sexual abuse].)
>
> We conclude the admissible evidence presented at trial contained substantial evidence to support the jury's verdicts as to counts 3 and 4 and that the trial court did not abuse its discretion in so finding.

*People v. Salazar*, 2004 WL 238805 at *12. In other words, the state court found that there was sufficient evidence to support the verdict, even without the use of the "fresh complaint" testimony.

In order to grant Petitioner federal habeas relief, this court must determine that the California Court of Appeal's determination that there was enough evidence to satisfy petitioner's conviction "was not contrary to, or involved an unreasonable application of clearly established Supreme Court precedent, or involved an unreasonable determination of the facts." 28 U.S. § 2254. The Due Process Clause forbids a state to convict a person of a crime without proving the elements of that crime beyond a reasonable doubt. *Bunkley v. Florida*, 538 U.S. 835, 840 (2003). The relevant question in reviewing the sufficiency of the evidence to support a criminal conviction is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). The essential elements of an offense are established by state law. *Id.* at 324 n. 16.

California Penal Code section 288 is violated when there is "any touching" of an underage child committed with the intent to sexually arouse the defendant or the child. *People v. Martinez*, 11 Cal. 4th 434, 442 (1995).

The California Court of Appeal relied on two pieces of evidence to determine the requisite "touching" had taken place: R.'s trial testimony and the

videotaped testimony given by R. to Detective Guess. An independent review of the record suggests that R.'s trial testimony is ambiguous. But even without considering R.'s trial testimony, this court cannot say that the California Court of Appeal's determination was objectively unreasonable. In the videotaped interview conducted by Detective Guess with R., the following exchange took place:

> Raymond: Um, no. He, he makes us get on top of each other.
> Guess: What do you mean by that?
> Raymond: Gets top, push, makes me get on top of Jayla, and makes Jayla get on top of me.

Resp't Ex. 1-A at 188.

This testimony sufficiently satisfies the "touching" requirement under section 288 . California case law holds that a touching under section 288 is accomplished where "at the defendant's direction and for a lewd purpose, a young child touched himself or touched a third person." *People v. Scott*, 9 Cal. 4th 331, 343(1994).

The thrust of Petitioner's claims is that there was not enough evidence to prove that he received sexual gratification from forcing the children to lie on top of each other. In essence, he claims that he did not have the requisite intent to receive sexual gratification from the children's actions. In determining whether the specific intent component has been satisfied in section 288 cases, the trier of fact looks at *all* the circumstances. *Martinez*, 11 Cal. 4th at 1043 (emphasis added). Relevant factors used in determining specific intent are other acts of lewd conduct admitted or charged in the case and any coercion used to obtain the victim's cooperation. *Id*.

The California Court of Appeal relied on the following to uphold the trial

court's determination that petitioner had acted with the requisite intent:

> While defendant claims "there is absolutely no direct evidence of any sort in the record that [he] took any sexual gratification from these acts the children engaged in," the record established that defendant forced R. and J. to perform these acts in his presence. The nature of that particular conduct and its surrounding circumstances, as well as the other sexually motivated acts defendant engaged in with R. and J., establish the requisite intent.

*People v. Salazar*, 2004 WL 238805 at *12.

In the videotaped interview, the following exchange took place between Detective Guess and R.:

> Raymond: If, if Jayla was on the floor, I would be on Jayla's stomach, and if Jay, I was on the floor, Jayla would be on my stomach.
>
> Guess: Uh, I get you. So she'd be laying on top of you?
>
> Raymond: Yeah, and......
>
> Guess: (inaudible).
>
> Raymond: ...Richard, we. Whatever Richard says we have to do 'cause he'll hit us if we don't do it.

(Resp't Ex. 1-A at 189).

Taken in the light most favorable to the prosecution, the evidence shows that Petitioner coerced the children into lying on each other. At trial, the prosecution elicited evidence from both minors that was extremely graphic and compelling. The children both testified that Petitioner forced them to perform oral sex on him to the point he "peed" in their mouth. Even without the use of the "fresh complaint" testimony, there was ample evidence for a jury to conclude Petitioner acted with the requisite intent required for a conviction under section

288.  *See Jackson*, 443 U.S. at 319.

  The California Court of Appeal's rejection of Petitioner's due process claim was not contrary to, or involved an unreasonable application of clearly established Supreme Court precedent, or involved an unreasonable determination of the facts.  28 U.S.C. § 2254(d).  Petitioner is not entitled to federal habeas relief on his first and third claims.

    b.  <u>Confrontation Clause</u>

  Petitioner initially claimed that his Sixth Amendment right to confront his accuser was violated.  In his traverse, however, he rescinds his Confrontation Clause challenge, conceding that his victims testified at trial.  Traverse at 22.

  2.  <u>Ineffective Assistance of Counsel</u>

  Petitioner claims that he received ineffective assistance of counsel in violation of his Sixth Amendment rights.  Petitioner's claim is based on his belief that his counsel should have made an objection on hearsay grounds to evidence regarding Petitioner's previous juvenile adjudication.

  In order to prevail on an ineffective assistance of counsel claim, Petitioner must establish two things.  First, he must establish that counsel's performance was deficient, ie, that it fell below an "objective standard of reasonableness" under prevailing professional norms.  *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984).  Second, he must establish that he was prejudiced by counsel's deficient performance, ie, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.  A reasonable probability is a probability sufficient to undermine the confidence in the outcome.  *Id*.

  At trial, the prosecution sought to introduce Petitioner's previous juvenile

adjudication under California Evidence Code section 1108. Defense counsel objected on the grounds it was more prejudicial than probative under California Evidence Code section 352. The trial court admitted the evidence because it showed propensity. There was no objection on hearsay grounds.

The California Court of Appeal did not review the hearsay issue on appeal because it was not raised at trial. The court analyzed the claim as an ineffective assistance of counsel claim. The court rejected the claim for lack of prejudice determining that even if counsel committed error, "we are convinced it is not reasonably probable that a different result would have been obtained had the challenged section 1108 evidence been excluded." *Salazar*, 2004 WL 238805 at *7.

In his federal habeas petition, Petitioner claims that the admission of his previous juvenile adjudication was highly prejudicial. He argues that, "[t]here is every probability that the jury improperly relied on this prior act evidence to decide that Mr. Salazar was just a bad person, perhaps a pedophile, with the propensity to prey on young children . . . prejudice was plain on this record, and the court's finding . . . denies defendant's fundamental right to a fair trial." Pet. at 29.

For a federal court to grant habeas relief from a state court conviction under § 2254(d)(1), it is not enough to establish that the state court applied the *Strickland* factors incorrectly. *Bell v. Cone*, 535 U.S. 685, 698-699 (2002). Petitioner must prove that the state court applied the *Strickland* factors in an *objectively unreasonable* manner. *Id.* (emphasis added). The California Court of Appeal did not apply *Strickland* in an objectively unreasonable manner. The California Court of Appeal explained:

> During his trial testimony, R. testified defendant made R. touch defendant in a way that R. did not like. R. testified there were things he liked about living with defendant and

13

there were times that he "had fun" with defendant. However, R. also testified that defendant often put R. in the corner for a "[l]ong time," would spank R. "for no reason," and would put R. in a cold bath and dunk his head when R. was bad. R. said defendant would leave him in the cold bath and R. would only get out when defendant went to sleep. When asked whether there was anything else that defendant "would do or have [him] do that [he] did not like," R. said he did not want to say it "because it's gross." When the prosecutor said they wanted to hear about it, R. shook his hand and said "No." When the prosecutor said, "No one here thinks you're gross," R. responded, "No, [defendant's] the one who is the gross guy." Eventually, R. said the "gross stuff" would happen in the room where defendant and R.'s mother had a bed. R. said defendant's pants and underpants would go down at the same time and his "private came out." R. said he then had to "move his mouth." R. did not want to talk about what happened so the questioning switched to sports, candy, and chocolate until a morning recess was called. After the recess, R. testified that, when defendant's pants and underwear were down, defendant's hands would move from his sides to R.'s head and defendant would push R.'s head down to defendant's private and make R. "lick it." Defendant made R.'s "whole mouth go on to his private" and defendant's private would "[s]tay up" while defendant pushed R.'s mouth "up and down." R. testified that, whenever he would try to move his mouth away from defendant's private, defendant "would make [him] stay there longer," telling R. to "do it some more." R. testified that, when defendant had his private in R.'s mouth, he "accidentally went to the bathroom a little bit," adding that "something" came out of defendant's private and went into R.'s mouth and throat. R. said it tasted "[b]ad." When R. told defendant he had "peed" in his mouth, defendant told R. that it "was not pee." After defendant said it was not pee, R. swallowed it.

At the end of the prosecutor's direct examination of R., R. first said defendant did not have him and J. get on top of each other. He next said that when he told someone that that had happened, it was the truth. R. then said he was getting tired and that he wanted the prosecutor to stop asking him questions.

Registered nurse Brown testified J. was "really scared" when she reported that defendant made her take off her clothes and underwear and would tell her to lie on top of R. J. then quit talking and hid under the exam table in a fetal position. Registered nurse Alban testified that R. separately reported that defendant made J. take off her pants and underpants off and would have her lie on top of R. and then would have R. hold J.'s "butt cheeks" or would have them hold "each other's butt." When rehabilitation counselor Nigh spoke with J. at the shelter, J. whispered that defendant

14

"makes me lick his wee-wee and he puts his wee-wee in my butt."

At trial, J. testified defendant had pulled down his underwear and forced J. to "suck his private part" and that defendant had his hands on his "private part" when it was in J.'s mouth. When she tried to push him away, she could not do so. She also felt she could not say no to defendant "[c]ause he's a grown up." Defendant said, "if you do it more, I'll give you some soda." J. said she was forced to suck defendant's private part more than five times.

The admissible evidence reveals that R. and J. did not conspire to report defendant was molesting them so that defendant would be removed from their home since the children did not report the offenses until after they themselves were removed from the home based upon a report of neglect. They made their disclosure of sexual assualts when no family members were present and never indicated they wanted defendant removed from the family apartment. R. and J. each testified at trial to the charged sexual acts and lewd conduct. They each described acts in which defendant forced them to perform oral copulation upon him. Their testimony regarding these acts was very detailed in terminology expected of children their age. J. also described how defendant had made her and R. undress and lie on top of each other, and R. testified that he had been truthful when he previously had disclosed that defendant had them undress and lie on top of each other. Each sibling's testimony corroborated the testimony of the other regarding the sexual offenses, and R. and J.'s mother confirmed the sibling's complaints that defendant severely punished them by keeping them in a corner for long periods of time, placing them in cold water, and beating R. with a belt. J. and the physical evidence of bruises and the testimony of their grandmother further corroborated R.'s testimony regarding the severe punishment defendant imposed. In addition, the admission of evidence of the extrajudicial complaints made by R. and J. of a sexual offense showed that a prompt complaint was made, and that evidence substantiated the veracity of the trial testimony. Finally, J. and R. clearly identified defendant as their molester, and any suggestion that someone other than defendant molested them finds no support in the evidence.

In light of the above testimony, all of which was admissible, we are convinced it is not reasonably probable that a different result would have been obtained had the challenged section 1108 evidence been excluded. (*People v. Escobar* (1996) 48 Cal.App.4th 999, 1025, 55 Cal.Rptr.2d 883, abrogated on other grounds in *People v. Mendoza* (2003) 23 Cal.4 th 896, 919, 98 Cal.Rptr.2d 431, 4 P.3d 265.)

> Accordingly, we conclude defendant's ineffective assistance claim is not well taken. (*People v. Price, supra*, 1 Cal.4th at p. 440, 3 Cal.Rptr.2d 106, 821 P.2d 610.)

*Salazar*, 2004 WL 238805 at *6-7.

In light of the overwhelming evidence provided at trial to prove the Petitioner's guilt, it cannot be said that the California Court of Appeal applied the prejudice prong of *Strickland* in an objectively unreasonable manner. *See* 28 U.S.C. § 2254(d); *Strickland*, 466 U.S. at 694. Petitioner is not entitled to federal habeas relief on his ineffective assistance of counsel claim.

### 3. Denial of Motion to Dismiss Counts 3 and 4

Petitioner claims that the trial court's denial of his motion to dismiss counts 3 and 4 was an abuse of discretion because there was not enough evidence to sustain those counts. For the reasons set forth in section B.1.a., the claim is without merit.

### 4. Cumulative Error

Lastly, Petitioner claims that the cumulative impact of the improper admission of the fresh complaint and previous juvenile adjudication evidence denied him his right to a fair trial.

The California Court of Appeal explicitly rejected petitioner's claim that the cumulative effect of the alleged errors deprived him of his due process right to a fair trial:

> Here, where the few errors in this case were harmless, defendant cannot establish that it is reasonably probable he would have received a more favorable result in the absence of the errors. In other words, we are convinced that the defendant "received due process and a fair trial."

*Salazar*, 2004 WL 238805 at *12.

The Ninth Circuit has held that the cumulative effect of several trial errors may prejudice a defendant so much that his conviction must be overturned. *See Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th Cir. 2003); *Thomas v. Hubbard*, 273 F.3d 1164, 1179-81 (9th Cir. 2002). This not one of those cases, however. In light of the overwhelming evidence in this case, it cannot be said that the cumulative effect of the alleged trial errors so infected the trial with unfairness as to make the resulting conviction a denial of due process. *Cf. Alcala*, 334 F.3d at 893-95 (reversing conviction where multiple constitutional efforts hindered defendant's efforts to challenge every important element of proof offered by prosecution); *Thomas*, 273 F.3d at 1179-81(reversing conviction based on cumulative prejudicial effect of (a) admission of triple hearsay statement providing only evidence that defendant had motive and access to murder weapon; (b) prosecutorial misconduct in disclosing to the jury that defendant had committed prior crime with use of firearm; and (c) truncation of defense cross-examination of police officer, which prevented defense from adducing evidence that someone else may have committed the crime and evidence casting doubt on credibility of main prosecution witness). Petitioner is not entitled to federal habeas relief on his claim of cumulative error/prejudice.

## CONCLUSION

After a careful review of the record and pertinent law, the court is satisfied that the petition for a writ of habeas corpus should be DENIED.

The clerk shall enter judgment in favor of respondent and close the file.

IT IS SO ORDERED.

Dated  March 16, 2007

_____
CHARLES R. BREYER
United States District Judge

G:\CRBALL\2005\3250\Denial of habeas order.wpd